IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IFEOMA EBO**, individually, and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **WELLS FARGO BANK, N.A.** <br><br> Defendant. | Case No. <br><br><br><br><br><br> Jury Trial Demanded |

# CLASS ACTION COMPLAINT

NOW COMES Plaintiff IFEOMA EBO ("Plaintiff"), individually and on behalf of all others similarly situated, by and through counsel, and for her Class Action Complaint against Defendant WELLS FARGO BANK, N.A. ("Wells Fargo" or "Defendant"), states as follows:

## INTRODUCTION

1. This case concerns Wells Fargo's pervasive pattern and practice of placing Black Americans at a disadvantage in comparison to White Americans with respect to their applications for mortgage loans.

2. In fact, Wells Fargo's discriminatory practices were already the subject of a lawsuit brought by the United States Department of Justice ("DOJ") in 2012, which was resolved through a Consent Order (the "Consent Order").[1] Pursuant to the terms of that Consent Order, Wells Fargo was required to "provide[] $184.3 million in compensation" to borrowers—which was "the second

---

[1] *See, e.g.*, DOJ Complaint, available at: https://www.justice.gov/iso/opa/resources/951201271211384881962.pdf; Consent Order, available at: https://www.justice.gov/iso/opa/resources/14201271211384881962.pdf.

largest fair lending settlement in the [DOJ]'s history" to that point—and was required to institute procedures to ensure compliance with federal housing law.[2]

3. Unfortunately for Black Americans, as soon as the terms of that Consent Order expired, Wells Fargo reverted back to its discriminatory practices.

4. For example, according to a recent report from Bloomberg, "Wells Fargo approved fewer than half of Black homeowners' refinancing applications in 2020," which is a significantly lower rate than all other lenders.[3]  In fact, "Wells Fargo…was alone in rejecting more Black homeowners than it accepted."[4]

5. Moreover, based on a review of publicly available data from the Consumer Financial Protection Bureau ("CFPB")—collected under the Home Mortgage Disclosure Act ("HMDA"), which is codified as 12 U.S.C. §§ 2801, *et seq.*—Wells Fargo still lags behind its industry counterparts with respect to approving Black Americans' loan applications, and, even when Wells Fargo does approve Black Americans' loan applications, Wells Fargo offers them significantly less favorable interest rates.

6. As explained below, Wells Fargo's discriminatory practices violate, *inter alia*, the Equal Credit Opportunity Act ("ECOA")—codified as 15 U.S.C. §§ 1691, *et seq.*—the Fair Housing Act ("FHA")—codified as 42 U.S.C. §§ 3601, *et seq.*—and 42 U.S.C. § 1981 ("Section 1981").  Accordingly, Plaintiff, individually, and on behalf of all others similarly situated (the "Class"), seeks redress in connection with the harm she and other Class members incurred as a result of Wells Fargo's discriminatory practices and violations of federal law.

---

[2] *See*, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.
[3] *See*, https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.
[4] *Id*.

## PARTIES, JURISDICTION, AND VENUE

7. Plaintiff is a citizen of the United States and an adult resident of the City of New York, New York.

8. Defendant Wells Fargo Bank, N.A. is a business incorporated under the laws of the State of Delaware. Defendant maintains its principal place of business at 420 Montgomery Street, San Francisco, California 94104. Defendant does business in the state of New York and nationwide.

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as several of Plaintiff's causes of action arise under federal law.

10. This Court has personal jurisdiction over Defendant pursuant to N.Y. C.P.L.R. § 302(a), as Defendant routinely transacts business within the state of New York.

11. Venue lies in this District pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL ALLEGATIONS

12. Plaintiff and Class members are all Black Americans, and thus are members of a protected class.

13. Plaintiff and Class members each submitted an application for a mortgage loan from Defendant in connection with the purchase or refinancing of residential real estate ("Application").

14. Plaintiff and Class members were qualified to receive mortgage loans from Wells Fargo, and complied with all reasonable requirements imposed by Wells Fargo as necessary to substantiate their qualifications to receive mortgage loans.

15. Nevertheless, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

16. Plaintiff's and Class members' experiences with Wells Fargo were part of a larger pattern and practice of racial discrimination against Black Americans.

17. As noted above, Wells Fargo was already subjected to a DOJ lawsuit in 2012 alleging similar misconduct. That lawsuit was ultimately resolved through a Consent Order which provided for "the second largest fair lending settlement in the [DOJ]'s history" to that point.[5] Nevertheless, Wells Fargo's discriminatory practices continued.

18. For example, according to Bloomberg, in 2020, Wells Fargo approved Black Americans' loan refinancing applications at a rate of 47%, in comparison to a rate of 72% for White Americans—a 25% difference.[6] Other similarly-sized lenders had only a modest disparity between Black and White applicants, ranging from 7% to 12%.[7] For instance, Chase, "the largest U.S. bank by assets, accepted 81% of refinancing applications from Black homeowners in 2020 compared with 90% from White ones"—which only amounts to a 9% difference.[8]

19. Notably, Wells Fargo's 47% approval rate does not even account for the "27% of Black borrowers who began an application with Wells Fargo in 2020 [and then] withdrew it."[9]

---

[5] *See*, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.
[6] *See*, https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.
[7] *Id*.
[8] *Id*.
[9] *Id*.

When those applicants are factored in, it means that "only one-third of the 17,702 Black homeowners who sought refinancing [from Wells Fargo] were successful."[10]

20. The Bloomberg report also notes that "Wells Fargo approved a greater share of applications from low-income White homeowners than all but the highest-income Black applicants, who had an approval rate about the same as White borrowers in the lowest-income bracket."[11] Clearly, the disparity between Black and White applicants seeking refinancing from Wells Fargo has little do with creditworthiness.

21. Wells Fargo's discriminatory practices are also pervasive with respect to applicants for new mortgage loans.

22. Based on a review of publicly available data collected by the CFPB in accordance with the HMDA, in 2019, Wells Fargo approved Black Americans' loan applications at a rate that was approximately 21% lower than White Americans' loan applications. In comparison, three of the other largest lenders in the country—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage—approved Black Americans' loan applications at a rate that was "only" approximately 10% lower than White Americans' loan applications.

23. Moreover, even when controlling for common indicia of creditworthiness—*e.g.*, debt to income ratio, loan to value ratio, etc.—Wells Fargo approved Black Americans' loan applications at a rate that was, on average, approximately 9% lower than similarly situated White Americans' loan applications. In contrast, Chase—one of the largest mortgage loan lenders in the country—approved Black Americans' loan applications at a rate that was, on average, approximately 3% *higher* than similarly situated White Americans' loan applications. Chase is

---

[10] *Id.*
[11] *Id.*

not an outlier. When that same analysis is applied to data from three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage—it reveals that Black Americans' loan applications were approved at a rate that was, on average, approximately 2% *higher* than similarly situated White Americans' loan applications.

24. Even when Wells Fargo does approve Black Americans' loan applications, it offers them significantly less favorable terms than similarly situated White Americans.

25. According to the same dataset referenced above, the interest rates on loans offered by Wells Fargo to Black Americans were, on average, half a percentage point *higher* than the interest rates on the loans it offered to similarly situated White Americans, even when common indicia of creditworthiness are controlled for.

26. In comparison, there was no appreciable difference between the interest rates offered to Black Americans and similarly situated White Americans by three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage. For these lenders, the difference between the interest rates offered to Black Americans and similarly situated White Americans was, on average, only five hundredths of a percentage point—i.e., *ten times less* than Wells Fargo's disparity.

27. Wells Fargo's discriminatory practices are also evidenced by the fact that Wells Fargo artificially makes it more difficult for Black Americans to complete their applications for mortgage loans. For example, Wells Fargo has a pattern and practice of requiring Black Americans to repeatedly submit documentation that they have already submitted, or to submit additional documentation beyond what is necessary to determine their eligibility status.

28. Again, according to publicly available data collected by the CFPB in accordance with the HMDA, in 2019, new mortgage loan applications submitted by Black Americans to Wells

6

Fargo were either withdrawn or never completed approximately 17% of the time, in comparison to only 14% for White Americans.  But, there was no difference between Black Americans and White Americans with respect to applications submitted to three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage.   For these lenders, *both* Black Americans and White Americans either withdrew or never completed their mortgage loan applications 8% of the time.

29. The processing delays experienced by Black Americans who seek mortgage loans from Wells Fargo can prevent them from purchasing real property altogether because, in real estate transactions, time is frequently of the essence.  In other words, sellers of real property are simply unwilling to wait for Wells Fargo's unnecessarily lengthy loan approval process to be completed, and sellers move on to other potential buyers with whom they will not experience this problem.

30. Those processing delays also made it more difficult for existing Black property owners to refinance their mortgage loans and take advantage of historically lower interest rates, which have since begun to rise.

31. In light of the foregoing, Plaintiff and Class members were harmed by Wells Fargo's discriminatory practices in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

## FACTS RELEVANT TO PLAINTIFF

32. Plaintiff is a Black American, and thus is a member of a protected class.

33. In late 2021, Plaintiff began the process of searching for a new home to purchase. That search ended in October 2021, when Plaintiff found a property (the "Property") located in Kings County, New York—and more specifically, the East Flatbush neighborhood of Brooklyn—and entered into a contract (the "Contract") to purchase it for the price of $900,000.

34. Thereafter, Plaintiff submitted an application for a mortgage loan to Defendant in connection with the purchase of the Property ("Plaintiff's Application").

35. At the time Plaintiff applied for the Loan (defined below), Plaintiff had a credit score of approximately 800, an annual income of approximately $178,000, and no significant debt.

36. On November 1, 2021, Plaintiff received pre approval from Wells Fargo for a mortgage loan in the amount of $883,698 (the "Loan"), which would be used to purchase the Property. According to Wells Fargo, Plaintiff's pre approval was to expire on February 24, 2022.

37. After Plaintiff's Application was preapproved, Plaintiff began working with Wells Fargo to receive final approval for the Loan.

38. Per Wells Fargo's requests, Plaintiff submitted all necessary documentation to verify her qualifications for the Loan. Plaintiff timely provided Wells Fargo with documentation such as W-2 forms, paystubs, bank account statements, etc.

39. On December 29, 2021, Plaintiff received a "Commitment Letter" from Wells Fargo. According to the Commitment Letter, Plaintiff's Application was approved, and she only needed to submit some additional documentation "in order to complete the final underwriting and funding of" her Loan.

40. In January and February 2022, Wells Fargo informed Plaintiff that it required additional documentation to complete the underwriting process relative to Plaintiff's Application.

41. Notably, some of the additional documentation that Wells Fargo requested in January and February 2022 had *already* been submitted by Plaintiff (*e.g.*, recent paystubs from Plaintiff's employers).

42. Other documentation requested by Wells Fargo in January and February 2022 was unnecessary, unduly burdensome, and irrelevant to Plaintiff's qualifications for the Loan. For example, in one instance, Wells Fargo requested a written explanation as to why Plaintiff made a monthly credit card payment in the amount of $290 on her own credit card. In another instance, Wells Fargo requested a bank statement for a bank account that did not even exist.

43. As Wells Fargo's duplicative and unnecessary requests for documentation continued into February 2022, Plaintiff expressed her concern to Wells Fargo that she would not be able to complete the Loan application process by the time that her pre approval expired on February 24, 2022. Nevertheless, as of February 24, 2022, Plaintiff's Loan still had yet to receive final approval.

44. In March 2022, Wells Fargo continued to request additional documentation, much of which was duplicative of documentation that Plaintiff had already provided to Wells Fargo several times previously.

45. In sum, Plaintiff was highly qualified to receive a mortgage loan from Wells Fargo, and complied with all of Wells Fargo's reasonable requests for documentation to substantiate her qualifications. Yet, as of March 22, 2022—nearly a month after the Loan approval process should have concluded—Plaintiff still had not received final approval for her Loan.

46. On or about March 22, 2022, the seller of the Property canceled the Contract due to the fact that Wells Fargo had still not approved Plaintiff's Loan, and it was unclear when (or if)

that approval would ever come. That same day, Plaintiff informed Wells Fargo of the seller's decision. Accordingly, Plaintiff did not, and will never, receive the Loan.

47. As explained above, Plaintiff's experience with Wells Fargo was part of a larger pattern and practice of racial discrimination against Black Americans. Like the Applications of many other Black Americans who sought mortgage loans from Wells Fargo, Plaintiff's Application was never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant.

48. Plaintiff was harmed by Wells Fargo's discriminatory practices because she was unable to obtain the Loan—to which she was qualified—and was thus unable to purchase the Property, even though a similarly situated White American would have been able to do so. Plaintiff was also harmed by Wells Fargo's discriminatory practices because she spent time and money pursuing her Application that similarly situated White Americans would not have been required to expend.

## CLASS ACTION ALLEGATIONS

49. **Class Definition**: Plaintiff brings this action pursuant to Fed R. Civ. P. 23 on behalf of a Class of similarly situated individuals and entities, defined as follows:

> All Black Americans (1) who submitted applications to obtain or refinance a mortgage loan with respect to residential real property, (2) who were qualified to receive mortgage loans from Wells Fargo, and (3) whose applications were either (a) denied by Wells Fargo, (b) never completed, due to Wells Fargo's demands for documentation or information that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (c) granted by Wells Fargo, but on less favorable terms than a similarly situated White borrower would have received.

Excluded from the Class are: (1) the Judge to whom this case is assigned and the Judge's immediate family members; (2) Defendant, Defendant's agents, Defendant's employees, and other affiliates of Defendant; (4) any person(s) who executes and files a timely request for exclusion

10

from the Class; (5) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (6) the legal representatives, successors and assigns of any such excluded person.

50.     **Numerosity and Ascertainability**: Upon information and belief, the Class is comprised of more than 40 members.  This conclusion is reasonable because Wells Fargo is one of the largest mortgage providers in the country, and, based on publicly available data collected by the CFPB in accordance with the HMDA, received over 7,000 Applications for mortgage loans from Black Americans in 2019.  The Class is so numerous that joinder of all members is impractical.  The exact number of members in the Class is presently unknown, can only be ascertained through discovery, and can easily be identified through Defendant's records or by other means.

51.     **Commonality and Predominance**: All members of the Class have been subject to and affected by a uniform course of conduct: specifically, Wells Fargo's pattern and practice of racial discrimination against Black Americans.  Accordingly, there are questions of law and fact common to the proposed Class that predominate over any individual questions.

52.     **Typicality**: Plaintiff's claims are typical of the claims of the Class. As previously explained, Plaintiff, like all Class members, was subject to Wells Fargo's pattern and practice of racial discrimination against Black Americans, and did not receive a mortgage loan from Wells Fargo on terms that would have been the same as a similarly situated White Americans.  Therefore, Plaintiff and Class members were all harmed in the same way, and incurred damages as a result.

53.     **Adequacy**: Plaintiff will adequately represent the interests of the Class and does not have adverse interests to the Class. If individual Class members prosecuted separate actions it may create a risk of inconsistent or varying judgments that would establish incompatible standards

of conduct. A class action is the superior method for the quick and efficient adjudication of this controversy. Plaintiff's counsel has extensive experience litigating consumer class actions.

## COUNT I
### Violations of the Equal Credit Opportunity Act
### 15 U.S.C. §§ 1691, *et seq.*
### On Behalf of Plaintiff and the Class

54. Plaintiff repeats and realleges paragraphs 1-53 with the same force and effect as though fully set forth herein.

55. The ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction…on the basis of race [or] color." 15 U.S.C. § 1691(a)(1).

56. As one of the largest mortgage lenders in the country, Defendant "regularly extends, renews, or continues credit" and/or "regularly arranges for the extension, renewal, or continuation of credit." 15 U.S.C. § 1691a(e). Therefore, Defendant is a "creditor," as that term is defined by the ECOA.

57. Plaintiff and Class members each applied "for an extension, renewal, or continuation of credit" from Wells Fargo. 15 U.S.C. § 1691a(b). Therefore, Plaintiff and Class members are each an "applicant," as that term is defined by the ECOA.

58. Pursuant to 15 U.S.C. § 1691e, any creditor who violates the ECOA "shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class." 15 U.S.C. § 1691e(a). The ECOA further provides for recovery of attorneys' fees incurred in connection with such a claim. 15 U.S.C. § 1691e(d).

59. In general, to state a claim under the ECOA, a plaintiff must allege that: "(1) [she] was a member of a protected class, (2) [she] applied for credit from the defendant, (3) [she] was qualified for credit but the defendant denied [her] credit application, and (4) the defendant

12

continued to engage in the type of transaction in question with other parties with similar qualifications." *E.g.*, *Germain v. M & T Bank Corp.*, 111 F.Supp.3d 506, 526 (S.D.N.Y. 2015) (internal alterations and quotations omitted).

60. Importantly, however, ECOA "protection is not limited to those applicants who were rejected." *E.g.*, *Wilson v. Toussie*, 260 F.Supp.2d 530, 541 (E.D.N.Y. 2003) (quoting *Hargraves v. Capital City Mortg. Corp.*, 140 F.Supp.2d 7, 23 (D.D.C. 2000)). Accordingly, a plaintiff can also state a claim under the ECOA where, as a result of racial discrimination, a creditor's "investigation procedures" are more onerous, or a borrower receives approval for a loan, but on less favorable terms. *E.g.*, *Hargraves*, 140 F.Supp.2d at 23; *Phillips v. Better Homes Depot, Inc.*, 2003 WL 25867736, at *22 (E.D.N.Y. 2003).

61. Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property.

62. As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

63. Plaintiff and Class members were harmed by Defendant's violations of the ECOA in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the

same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

64. Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of the ECOA.

### COUNT II
### Violations of the Fair Housing Act
### 42 U.S.C. §§ 3601, *et seq.*
### On Behalf of Plaintiff and the Class

65. Plaintiff repeats and realleges paragraphs 1-53 with the same force and effect as though fully set forth herein.

66. The FHA makes it "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color…or national origin." 42 U.S.C. § 3605(a).

67. As one of the largest mortgage lenders in the country, Defendant's business includes engaging in residential real estate-related transactions because it regularly makes loans and provides financial assistance in connection with "purchasing, constructing, improving, repairing, or maintaining a dwelling," and those loans are "secured by residential real estate." 42 U.S.C. § 3605(b). Therefore, Defendant is subject to the FHA's anti-discrimination provisions.

68. 42 U.S.C. § 3613 provides for a private right of action against any person who violates the FHA. The FHA further provides for recovery of attorneys' fees incurred in connection with such a claim. 42 U.S.C. § 3613(c)(2).

69. In general, to state a claim under the FHA, "plaintiffs who allege disparate treatment must show: (1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers." *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 574 (E.D.N.Y. 2010) (internal quotations omitted).

70. However, like claims under the ECOA, racial discrimination need not result in an outright denial of an application for credit for purposes of stating a claim under the FHA; any less favorable outcome is sufficient. *E.g.*, *Hargraves*, 140 F. Supp. 2d at 20-22.

71. Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property.

72. As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

73. Plaintiff and Class members were harmed by Defendant's violations of the FHA in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and

money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

74. Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of the FHA.

**COUNT III**
**Violations of the Section 1981**
**42 U.S.C. § 1981**
**On Behalf of Plaintiff and the Class**

75. Plaintiff repeats and realleges paragraphs 1-53 with the same force and effect as though fully set forth herein.

76. Under Section 1981, "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts," which "includes the making, performance, modification, and termination of contracts." 42 U.S.C. § 1981(a)-(b). The rights guaranteed by Section 1981 "are protected against impairment by nongovernmental discrimination" (42 U.S.C. § 1981(c)), and are enforceable through 42 U.S.C. § 1988, which provides for the recovery of attorney fees' and costs incurred in connection with a successful action under Section 1981 (42 U.S.C. § 1988(b)).

77. "To establish a claim under [Section] 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (*i.e.*, make and enforce contracts, sue and be sued, give evidence, etc.)." *E.g.*, *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2nd Cir. 1993).

78. Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property. In other words, Plaintiff and Class members are each a member of a racial minority who sought to engage in the making of a contract.

79. As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

80. Accordingly, Defendant denied Plaintiff and Class members the same ability to make and enter into contracts "as is enjoyed by White citizens" of the United States. 42 U.S.C. § 1981(a).

81. As evidenced by the pervasiveness of Defendant's racial discrimination in its lending practices, Defendant intended to discriminate against Plaintiff and Class members on the basis of race.

82. Plaintiff and Class members were harmed by Defendant's violations of Section 1981 in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they

spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

83. Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of Section 1981.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff IFEOMA EBO, individually, and on behalf of the Class, prays for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class defined herein;

B. Designating Plaintiff as representative of the Class and her undersigned counsel as Class Counsel;

C. Entering judgment in favor of Plaintiff and the Class and against Defendant as to each and every Count, as applicable;

D. Awarding Plaintiff and the Class actual damages, statutory damages, and punitive in an amount to be determined at trial as to each and every Count, as applicable;

E. Awarding Plaintiff and the Class attorneys' fees and costs, including interest thereon, as allowed or required by law, as to each and every Count, as applicable; and

F. Granting all such further and other relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.

DATED: April 4, 2022        */s/ Javier L. Merino*
                            Javier L. Merino
                            DANNLAW
                            1520 U.S. Highway 130, Suite 101
                            North Brunswick, NJ 08902

(201) 355-3440
(216) 373-0536 e-fax
notices@dannlaw.com

Marc E. Dann (*pro hac vice* anticipated)
Brian D. Flick (*pro hac vice* anticipated)
DANNLAW
15000 MADISON AVENUE
LAKEWOOD, OH 44107
(216) 373-0539 telephone
(216) 373-0536 facsimile
*notices@dannlaw.com*

Thomas A. Zimmerman, Jr. (*pro hac vice* anticipated)
*tom@attorneyzim.com*
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile

*Attorneys for Plaintiff and the putative Class*